CHASEZ, Judge.
The plaintiff, Donald H. Reynolds, filed this suit against the defendants Olen W. Buckwalter, Villarrubia Taxicab Rental Company, Incorporated and St. Louis Fire and Marine Insurance Company of St. Louis, Missouri, for damages resulting from an automobile collision.
The case was tried on January 16, 1968, and judgment was rendered in favor of plaintiff against the defendants in the amount of $1,406.94. The defendants have taken this appeal admitting negligence but claiming that plaintiff was also guilty of negligence thus precluded from recovery.
The trial judge gave no reasons for his decision and we are unable to determine the factual conclusions upon which he based his judgment. Certain facts however do seem clear from the record.
The accident occurred at the intersection of General Pershing Street and St. Charles Avenue in the City of New Orleans, at approximately 10:30 A.M. on May 23, 1965. St. Charles Avenue is a well known two-way street, divided by a wide neutral ground. General Pershing Street is a one-way street on the lake side of St. Charles Avenue and becomes a two-way street on the river side of the avenue.
Plaintiff had been proceeding on General Pershing Street from the direction of the lake and had brought his vehicle to a stop at the intersection with St. Charles Avenue, in obedience to a stop sign.
Defendant Buckwalter, driving a taxicab owned by defendant Villarrubia Taxicab Rental Company, Incorporated, and insured by defendant St. Louis Fire and Marine Insurance Company of St. Louis, Missouri, had been proceeding on St. Charles Avenue from an uptown direction. When he reached the intersection of the avenue and General Pershing Street, he made a left turn onto General Pershing Street where it crosses the neutral ground on the avenue. He brought his vehicle to a stop in the neutral ground with the intention of making another left-hand turn so that he could go back onto the avenue toward uptown New Orleans.
Immediately prior to the accident, then, both vehicles were stopped opposite one another waiting to turn onto St. Charles Avenue to proceed in the same direction toward uptown New Orleans. The accident occurred as they were attempting to make their turns.
*68 The New Orleans Police Officer who investigated the accident was unable to appear at the trial but his accident investigation report was introduced into evidence by stipulation of both counsel with the further stipulation that the officer would testify in accordance with the report if he were present.
From the diagram of the accident scene included in this report it appears that both vehicles were in the act of turning at the time of impact. Plaintiff’s vehicle was farther into his turn than was defendant Buckwalter, however, it is evident that plaintiff had not finished the maneuver. This is borne out both by the diagram itself, and from the testimony that plaintiff’s vehicle was struck on its left rear side rather than directly from the rear. Buckwalter admitted that his taxi did strike the plaintiff’s vehicle.
It is interesting to note that in the “contributing circumstances” section of the accident report, the officer noted both drivers for “other improper driving”, with the explanation “Investigator was undecided who to take action against in this matter therefore the City Attorney will be consulted.”
Each driver testified at the trial below as to his version of the accident.
Defendant Buckwalter stated on cross-examination :
“Q. At about 10:00 A.M. on May 23, 1964, sir, were you involved in an automobile accident with the plaintiff, Mr. Donald Reynolds who is sitting here in Court ?
A. Yes, sir.
Q. And where did that accident occur, sir?
A. How did it occur ?
Q. Where?
A. General Pershing and St. Charles.
Q. And where were you, sir, where were you coming from at the time of the accident, sir ?
A. Well, I had picked up passengers at the Roosevelt Hotel and went up St. Charles and went to the end, because the people wanted to see the homes along St. Charles, so I swing around, I’m coming back down towards town, turn in the neutral ground.
Q. At what street?
A. General Pershing.
Q. And what did you do then, sir?
A. Seen the car come over, stop at the —on the right towards the river on General Pershing, I turned my left turning signal on and I’m looking to the right to see if any other oncoming automobile—
Q. Are you stopped at this sime, sir, you stopped in the neutral ground section of St. Charles Avenue heading away from the river, is that correct?
A. Yes, sir, and I looked to the right to see if any other automobiles are coming and there was no automobiles and I'm starting to ease out and I looked around and the gentleman was in front of me.
Q. And are you testifying that you ran into this other gentleman’s car ?
A. I did hit the man’s car.
Q. What portion of your automobile?
A. My right front fender.
Q. And struck what portion of the other man’s car, Mr. Reynolds’ automobile ?
A. Well, in the quarter panel of his car.
Q. Which quarter panel ?
A. Left, left rear.”
*69 ******
Q. “Did you see the plaintiff stopped at this stop sign, sir ?
A. Yes, he was stopped, but I was there when he had stopped, when he had pulled up I was already there and I had my left turning signal on and so I have the right of way, I know I have the right of way, and so I’m looking at the right to see if there’s any on-coming automobiles and I’m easing out, because there’s some bushes there and it is kind of hard to see around, so I was kind of easing out to see — make sure there were no automobiles coming and by the time I looked around—
Q. So, in other words, you were making a left turn and your vehicle was going in a forward direction while you were looking at the right to see if there were cars coming up St. Charles, is that your testimony, sir ?
A. I’m just easing out a little bit, just to see if there’s any other cars coming, if I sit down, when I have to sit there all day, unless I get outside of my car, walk out to the street to see if there are any cars.
Q. What do you mean by easing out, do you mean you had forward motion of your vehicle ?
A. Yes.
Q. And at this time you weré looking at your right, you were not looking in front of you at this time?
A. Well, I looked in front of me, I had looked back to the right, I looked back, but I’m easing out, but I’m easing out, I give it the gas, I was back to the right again to make sure that nobody was coming out in front of me, I looked back to the right again, I give it the gas and when I turned back around he was there.
Q. Well, did you make any effort to stop your car to avoid this accident ?
A. Yes, I did.
Q. And the effort was unsuccessful, I take it?
A. Yes.
Q. What effort did you make to avoid the accident?
A. To hit my brakes.
Q. Did you actually see him before you hit him or did you hit him first and then looked around to see ?
A. Well, I looked around and I seen him, I hit my brakes at the same, time, naturally, there’s a second between the time your brain gets down to your feet.
Q. And about how long after that before the impact came ?
A. Right then, as soon as I hit my brakes I was hitting him.”
* * * * * *
Plaintiff testified on direct examination:
A. “I had just dropped the children off at church for Sunday School and I was proceeding back home. I had stopped at the stop sign of General Pershing and St. Charles, I waited for traffic to clear, I pulled out to make a right turn on St. Charles and the taxi, which was at the neutral ground, I noticed he was looking down St. Charles, he had hit me in the left rear after I had made my turn. There were passengers in the taxi, I believe they were tourists, but essentially this is what transpired.”
BY MR. WILLOZ:
Q. “What part of your automobile was hit, sir?
A. The left rear quarter panel.
*70 Q. And this was hit by what portion of the cab ?
A. The right front of the taxi.
Q. Had you seen the cab prior to the accident, sir?
A. Yes, I saw him at the neutral ground, he had stopped at the neutral ground and I don’t know from which direction, but I did notice he was there at the neutral ground. I had been waiting quite some time for traffic to clear, because it was rather heavy at that time on a Sunday morning and so as soon as traffic cleared I turned off General Pershing onto St. Charles.
Q. Did you have your turn indicators operating, sir?
A. Yes, sir.
Q. And what was your turn indicator indicating, sir?
A. A right turn.
Q. Did you notice any turn indicators on the cab?
A. No, I didn’t.”
Later on cross-examination the plaintiff testified:
Q. “Is there a stop sign at General Pershing and St. Charlés facing you in the direction in which you were proceeding on that day ?
A. Is there a stop sign at General Pershing and St. Charles ?
Q. Facing you, the direction in which you were going?
A. Where I was, yes, there is.
Q. Is General Pershing a one-way or two-way street?
A. At that point it’s one way.
Q. Now, you saw this other vehicle on the neutral ground stopped ?
A. I did.
Q. And did you look in your direction of your left to see if any traffic was coming ?
A. I did.
Q. Did this other vehicle start across too at the same time you started to cross ?
A. No.
Q. Were you watching the other vehicle or watching to your right at that time?
A. I was watching where I was going.
Q. Well, where were you going?
A. To the right.
Q. Well, were you watching to your right or were you watching to the left?
A. As I made my turn I looked to see that traffic had cleared and that nothing was coming, then I proceeded to turn right.
Q. You completely disregarded this vehicle' on the neutral ground, did you not?
A. I did not.
Q. Well, what did you do, how did you regard him?
A. I regarded him as a taxicab driver waiting for traffic to clear, as I was.
Q. You thought that he had to let you go first, you had the right of way, did you not?
A. I did not.
*71 Q. Well, why did you proceed into the neutral ground without letting him into the right — into the right, without letting him go across ?
A. I had no idea what his intentions were or how long he was going to be there.
Q. Well, he couldn’t go across the street and go completely into General Pershing Street, could he, because General Pershing Street was a one-way street ?
A. I can’t testify as to what he would do.
Q. Well, it’s the general procedure, you know that people don’t go into one-way streets to buck traffic, do you?
A. I have no idea, I can’t answer for his driving.
Q. And just as you made your turn to the right he made his turn to the left and you all had a collision, let’s say he ran into you, let’s say that, is that right ?
A. He ran into me, that’s right.
Q. Just as you made your turn to the right and he made his turn to the left?
A. I was already into St. Charles Avenue when he hit me.
Q. Well, he was already in St. Charles Avenue, or he couldn’t have hit you, wasn’t he in St. Charles Avenue, too?
A. Behind me, yes.
Q. And he hit you in the right center or toward the front a little bit, is that right?
A. No.
Q. Where did he hit you ?
A. The left rear quarter panel.
Q. What kind of car is this you have, a two door car or a four door car?
A. It was a two door car.
Q. Two door car?
A. Correct.
Q. Did he hit you in the door ?
A. No.
Q. Where did he hit you ?
A. The left rear quarter panel.
Q. Did the police come on the scene of the accident?
A. He did.
Q. Had the vehicles been moved when the police came?
A. They had not.
Q. They were still there ?
A. They were.
Q. Is this the correct drawing — this has been offered and introduced in evidence, this is the police report I show you and is it the correct drawing?
A. This is my car.
Q. Number two is your car ?
A. That’s right, and this is the taxi.
Q. Yes.
A. That’s close.
Q. That’s close. Therefore, you were hit in the side ?
A. I was hit in the left rear quarter panel.”
As stated above it is not the defendants’ position in this appeal that Buck-waiter was free from negligence in this matter. Rather it is their contention that the accident occurred through the negli *72 gence of both drivers, and therefore plaintiff is precluded from recovery by his own negligence.
We agree with the defendants’ contention. The plaintiff admitted that he was stopped at the intersection in obedience to a stop sign. He also admitted that he was aware that the defendant Buckwalter was stopped on the neutral ground facing him, but he did not realize that Buckwalter was also intending to turn onto St. Charles Avenue, even though there was no other course of action legally open to Buckwalter, as General Pershing Street was a one-way thoroughfare as it faced him. Under these circumstances plaintiff was negligent in making his turn onto the avenue without first ascertaining when the defendant would attempt his turn. Plaintiff was stopped in obedience to a stop sign thus was not in a more favored position than Buckwalter and should not have assumed that he had the right of way over him.
It is well settled that a driver who brings his vehicle to a stop in obedience to a stop sign discharges but half of his duty; he must also ascertain that the way is clear for him to proceed safely into the intersection. Askew v. Hamilton, 146 So.2d 471, La.App. 3 Cir. 1962; and cases cited therein.
It is apparent both drivers gave little or no regard to the other; had either taken the proper care commensurate with the circumstances, the accident would not have occurred.
For the reasons hereinabove stated the judgment of the lower court is reversed and judgment is rendered herein in favor of defendants-appellants Villarrubia Taxicab Rental Company Incorporated, Olen V. Buckwalter and St. Louis Fire and Marine Insurance Company of St. Louis, Missouri and against plaintiff-appellee, Donald H. Reynolds, dismissing his suit; plaintiff-appellee to pay all costs of both courts.
Reversed.